## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **RAFAEL KENNEDY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:21-cv-00266-GCS** |
| | ) | |
| **VENERIO SANTOS & BRIAN JONES,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Pending before the Court are Defendants' Motions for Summary Judgment. (Doc. 109, 112). Defendant Dr. Venerio Santos ("Santos") filed his Motion for Summary Judgment along with an accompanying Memorandum of Law in Support on April 10, 2024. (Doc. 109, 110). Defendant Brian Jones ("Jones") filed his Motion for Summary Judgment along with a Memorandum of Law in Support on April 12, 2024. (Doc. 112, 113). Plaintiff Rafael Kennedy filed Responses to Defendants' Motions for Summary Judgment on April 16, 2024. (Doc. 116, 117). Defendant Santos filed a Reply to Plaintiff's Response on April 29, 2024. (Doc. 119). For the reasons delineated below, Defendant Santos's Motion for Summary Judgment is **GRANTED**. (Doc. 109). Defendant Jones's Motion for Summary Judgment is **DENIED**. (Doc. 112).

### PROCEDURAL BACKGROUND

Plaintiff, a former inmate of the Illinois Department of Corrections ("IDOC") previously housed at Centralia Correctional Center ("Centralia"), brings this civil rights

action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. (Doc. 12).[1] In his Amended Complaint, Plaintiff claims that he received inadequate medical treatment for persistent chest pain, cysts, and abdominal hernia. *Id.* The Court construed Plaintiff's Amended Complaint into the follow counts against the Defendants:

> Claim 1: Eighth Amendment deliberate indifference claim against Defendants Dr. Santos, Dr. Pelegrin, and Dr. Shaw concerning Plaintiff's chest pain, cysts and hernia; and

> Claim 2: Eighth Amendment deliberate indifference claim against Defendant Jones for ignoring Plaintiff's repeated requests for care.

(Doc. 23, p. 3).  The Court found that both claims, as described by Plaintiff, survived screening. *Id.* at p. 4. Accordingly, the Court issued a scheduling order pertaining to the issue of exhaustion of administrative remedies on May 19, 2022. (Doc. 55).

Defendants Dr. Jodi Pelegrin ("Pelegrin"), Dr. Santos, and Dr. Vipin Shah ("Shah") filed their Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies along with a Memorandum of Law in Support on July 19, 2022. (Doc. 57, 58). Defendant Jones filed a Motion to Withdraw the Affirmative Defense of Failure to Exhaust Administrative Remedies on July 20, 2022. (Doc. 60). Plaintiff also filed a Response to Defendants' Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies on July 20, 2022. (Doc. 61). The Court granted Defendant Jones's Motion to Withdraw the Affirmative Defense on July 21, 2022. (Doc. 63).

---

[1]     Plaintiff updated his address with the Court on December 2, 2024. (Doc. 124). Plaintiff indicated that he is currently housed at Kewanee Life Skills Re-Entry Center in Kewanee, Illinois. *Id.*

The Court held two hearings on Defendants' Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies. The first hearing, held on August 29, 2022, ended prematurely due to technical difficulties. (Doc. 70). The second hearing was held on September 12, 2022. (Doc. 73). On February 9, 2023, the Court issued an order granting in part and denying in part Defendants' Motion for Summary Judgment. (Doc. 78). The Court denied the Motion as to Defendant Santos concerning the alleged improper treatment of Plaintiff's chest pain and hernia but granted the Motion as to Defendant Santos's treatment of Plaintiff's cysts. *Id.* at p. 18. The Court granted the Motion as to Defendants Pelegrin and Shah. *Id*. Accordingly, the Court dismissed all of Plaintiff Kennedy's claims against Defendants Pelegrin and Shah, as well as his claim against Defendant Santos concerning the treatment of his cysts. *Id.* Plaintiff's claims against Defendant Brain Jones as well as the claims against Defendant Santos in relation to the care provided for his chest pain and hernia remain.

## Factual Background

### A.    Plaintiff's Medical Records

Plaintiff Kennedy was transferred to Centralia from Illinois River Correctional Center ("Illinois River") on May 29, 2019. (Doc. 110, Exh. 3, p. 1). Plaintiff's Offender Health Status Transfer Summary, dated May 25, 2019, indicates that he suffered from the following chronic conditions: "asthma, hypothyroid and Gerd." *Id.* Plaintiff's hernia was not a documented condition or limitation in his Offender Health Status Transfer Summary. *Id.*

Upon arriving at Centralia, Plaintiff was seen by a nurse as a part of the inmate

intake process at 5:00 pm. *Id.* Plaintiff's blood pressure was taken two times during this initial examination. *Id.* Plaintiff's first blood pressure reading was 147/91. *Id.* His second blood pressure reading was 149/83. *Id*

Later that same evening, at approximately 9:30 pm, another nurse initiated the Hypertension – Elevated/Uncontrolled Blood Pressure protocol. (Doc. 110, Exh. 3, p. 2). Plaintiff reported no previous history of hypertension, but he indicated he was experiencing dizziness and blurred vision on and off. *Id.*  Plaintiff's blood pressure was taken two times, three minutes apart. *Id.* Plaintiff's first blood pressure reading was 180/105, and the second reading was 176/100. *Id.* Plaintiff's blood pressure was taken again when he was relaxed and seated. *Id.* That blood pressure reading was 178/108. *Id.* The nurse noted that an MD referral was appropriate, noting that Plaintiff's "BP [was] greater than or equal to 140/90 but less than 179/119 and asymptomatic, see MD next sick call as Priority; if no available sick call within 48 hours call MD." *Id.*

On May 30, 2019, at approximately 10:00 am, Defendant Dr. Santos saw Plaintiff for a high blood pressure evaluation. (Doc. 110, Exh. 3, p. 4). Plaintiff's blood pressure was reported as 157/90. *Id.* Plaintiff self-reported to Dr. Santos that his family had a history of hypertension. *Id.* Santos performed a physical examination of Plaintiff, noting that he was alert and in no acute distress. *Id.* He also found Plaintiff's lungs to be clear. *Id.* Santos assessed Plaintiff as possibly having hypertension and a headache. *Id.* Santos advised Plaintiff to reduce his salt intake, to increase his exercise, and to take Tylenol per protocol for his headache. *Id.* Santos planned to conduct daily blood pressure checks for three days and to follow-up with Plaintiff in two days' time. *Id.*

On May 31st and June 1st, Plaintiff's blood pressure readings were 174/88 and 172/98, respectively. (Doc. 110, Exh. 3, p. 164).

On June 1, 2019, at approximately 9:20 am, Dr. Santos saw Plaintiff for a follow-up visit to evaluate his blood pressure. (Doc. 110, Exh. 3, p. 5). Plaintiff self-reported having a headache "on and off." *Id.* Santos completed a physical evaluation of Plaintiff, noting that Plaintiff's heart was within normal limits with no carotid bruit or JVD. *Id.* He also observed no edema. *Id.* Santos concluded that Plaintiff had a new onset of hypertension as his medical chart did not indicate a prior history of hypertension. *Id.* Dr. Santos prescribed 10 mg of Lisinopril (an ACE inhibitor that treats high blood pressure) and 2 mg of HCTZ (a diuretic that treats high blood pressure and fluid retention). *Id.* He also ordered that Plaintiff undergo daily blood pressure checks for five days to ensure that the prescribed medications effectively lowered his blood pressure. *Id.*

On the evening of June 1st, at 5:30 pm, Plaintiff saw a nurse for complaints of dizziness and blurred vision. (Doc. 110, Exh. 3, p. 6). The nurse noted that Plaintiff had taken his first dose of Lisinopril and HCTZ that morning, but his blood pressure remained high. *Id.* His first blood pressure reading was 172/98, his lying blood pressure was 187/103, and his standing blood pressure was 183/109. *Id.* at p. 6. Plaintiff was admitted to the health care unit ("HCU") for 23 hours of observation and administered 0.2 mg of Clonidine (an antiadrenergic agent that lowers blood pressure by decreasing the levels of certain chemicals in the blood). *Id.* at p. 6.

While in the HCU, nurses wrote six separate progress notes documenting Plaintiff's care. (Doc. 110, Exh. 3, p. 8-12).

**Progress Note 1, dated June 1, 2019 – 5:50 pm** indicates that Plaintiff
complained of dizziness. The note states that reasons for Plaintiff's
admission to the HCU were dizziness and elevated blood pressure. (Doc.
110, Exh. 3, p. 8). The nurse noted that the admission orders were to
continue to monitor Plaintiff's blood pressure and indicated that they had
received telephone orders from Dr. Santos. *Id.*

**Progress Note 2, dated June 1, 2019 – 8:00 pm** states that Plaintiff reported
not feeling as dizzy, but he remained worried about his blood pressure.
(Doc. 110, Exh. 3, p. 9). Plaintiff's blood pressure was taken and was
170/110. The nurse noted that the HCU would continue Plaintiff's plan of
care. *Id.*

**Progress Note 3, dated June 2, 2019 – 4:00 am** notes that Plaintiff asked if
his blood pressure was ok. (Doc. 110, Exh. 3, p. 9). The nurse took Plaintiff's
blood pressure which was 120/76. *Id.* Plaintiff denied experiencing any
chest pain, discomfort, or dizziness at this time. *Id.* The nurse also noted
that Plaintiff never voiced any other needs or concerns and did not appear
to be in acute distress. *Id.* The nurse planned to continue the existing plan
of care. *Id.*

**Progress Note 4, dated June 2, 2019 – 8:00 am** reports that Plaintiff was no
longer dizzy. (Doc. 110, Exh. 3, p. 10). However, the nurse noted that
Plaintiff's blood pressure remained elevated prior to receiving medication.
*Id.* Upon physical examination, Plaintiff's chest was found to be clear, and
he denied experiencing any chest pain. *Id.* Plaintiff's lying blood pressure
was 143/90 and his standing blood pressure was 157/95. *Id.* The nurse
noted that the HCU would continue the existing plan of care. *Id.*

**Progress Note 5, dated June 2, 2019 – 12:00 pm** indicates that Plaintiff was
discharged from the infirmary, and he stated he was feeling better. (Doc.
110, Exh. 3, p. 11). Plaintiff's blood pressure reading at the time of release
was 134/82. *Id.* Plaintiff also did not report any chest pain or dizziness. *Id.*
Plaintiff was placed on the MD line the following day for a follow-up
appointment. *Id.*

**Progress Note 6, dated June 2, 2019 – 12:20 pm** reports that Plaintiff
underwent an electrocardiogram ("EKG"). (Doc. 110, Exh. 3, p. 12). The
EKG was read by Dr. Jack Newman at 7:33 pm, noting "Sinus bradycardia,
Borderline ECG." *Id.* at p. 128.

On June 3, 2019, a nurse noted that Plaintiff's chart was reviewed for chronic

conditions, and his hypertension clinic was due in May 2019. (Doc. 110, Exh. 3, p. 12). The nurse also reported that Plaintiff's asthma clinic was current. *Id.* Plaintiff's hypertension clinic evaluation was to be scheduled by June 18, 2019. *Id.* Plaintiff's blood pressure was then taken daily with the following readings: June 3, 2019 - 155/92 (after taking medication); June 4, 2019- 147/95; June 5, 2019 – 162/91; June 6, 2019 – 151/78; June 7, 2019 – 142/78; June 8, 2019 – 135/72; June 9, 2019 – 122/63; and June 10, 2019 – 139/76. *Id.* at p. 164-165.

Dr. Santos saw Plaintiff for a follow-up on June 4, 2019. (Doc. 110, Exh. 3, p. 13). Plaintiff did not report any new complaints to Dr. Santos. *Id.* Santos planned to continue medications, to reduce Plaintiff's salt intake, and to increase his exercise. *Id.* Santos noted that Plaintiff's blood pressure reading was high, but he was "newer on meds." *Id.*

Santos saw Plaintiff for complaints related to uncomfortable shoes on June 12, 2019. (Doc. 110, Exh. 3, p. 14). Plaintiff's blood pressure reading was 141/76. *Id.* The medical records do not indicate that Plaintiff made any complaints about his blood pressure or hernia. *Id.*

On June 13, 2019, Plaintiff saw Dr. Santos for a follow-up for his blood pressure. (Doc. 110, Exh. 3, p. 15). Plaintiff's blood pressure was slightly elevated at 136/65. *Id.* Dr. Santos noted that Plaintiff's blood pressure was controlled and that daily blood pressure checks were no longer necessary. *Id.* He instructed Plaintiff to continue his medication as directed. *Id.*

On July 21, 2019, Plaintiff saw a nurse complaining of a hernia located in the upper left part of his abdomen. (Doc. 110, Exh. 3, p. 16). Plaintiff reported that his pain was an

8, and he described the pain as stabbing and constant. *Id.* Plaintiff first noticed the pain on June 18, 2018. *Id.* Plaintiff's blood pressure was 135/77. *Id.* The nurse noted that Plaintiff's abdomen was tender to touch but noted that she did not find an "obvious hernia" at this time. *Id.* The nurse provided Plaintiff with 200 mg of Ibuprofen for 3 days, with instructions to return and see a provider if his pain worsened. *Id.* She also placed Plaintiff on the MD line for further evaluation. *Id.*

Plaintiff saw Dr. Santos for complaints of upper left quadrant pain with an alleged abdominal hernia on July 23, 2019. (Doc. 110, Exh. 3, p. 17). Santos observed that there was a small palpable lump to Plaintiff's left upper abdominal quadrant with no tenderness, bulging, or pain, and he had positive bowel sounds. *Id.* Santos's assessment ruled out an abdominal hernia or impaction. *Id.* He planned to order Plaintiff an abdominal binder and to instruct him to avoid heavy lifting. *Id.* Plaintiff was issued a 35-inch abdominal binder by a nurse on August 2, 2019. *Id.* at p. 18.

On August 23, 2019, Plaintiff saw a nurse for complaints of right lower quadrant abdominal pain. (Doc. 110, Exh. 3, p. 19). Plaintiff reported that he was experiencing pain like that caused by his hernia, but in a different location. *Id.* The nurse did not observe any visible deformity and no visible hernia. *Id.* The nurse referred Plaintiff to the doctor as he self-reported lower quadrant pain that became worse with urination. *Id.*

Santos saw Plaintiff for complaints of right lower quadrant abdominal pain upon urination on August 26, 2019. (Doc. 110, Exh. 3, p. 20). Plaintiff reported to Santos that he urinated approximately 30-40 times per day. *Id.* Dr. Santos's assessment was non-specific urination. *Id.* He instructed Plaintiff to increase fluids, to avoid caffeine, and to follow-up

in one week. *Id*. Plaintiff's blood pressure was 133/69. *Id*. Santos did not note that Plaintiff

made any complaints about his blood pressure. *Id*.

On September 10, 2019, Santos saw Plaintiff for an unrelated issue with his

hearing. (Doc. 110, Exh. 3, p. 22). Santos referred Plaintiff to an outside audiologist on

September 18, 2019. *Id*. at p. 23, 53.

On November 26, 2019, Santos saw Plaintiff in the general medicine chronic clinic

(for hypothyroidism) and the hypertension chronic care clinic. (Doc. 110, Exh. 3, p. 152-

153). It was noted that Plaintiff was prescribed HCTZ and Lisinopril and that the

prescriptions were active until June 2, 2020. *Id*. Santos noted that Plaintiff had no

complaints, and he educated Plaintiff on non-compliance risks with his medication. *Id*.

Plaintiff verbalized his understanding. *Id*. Plaintiff's blood pressure reading was 135/81,

and Dr. Santos noted that Plaintiff's hypertension/cardiac outcome was good and that

his condition was stable. *Id*. Santos continued Plaintiff's established treatment plan. *Id*.

Plaintiff saw non-defendant Dr. Reynal Caldwell in the asthma, general medicine

(for hypothyroidism), and hypertension chronic care clinics on January 16, 2020. (Doc.

110, Exh. 3, p. 154-155). It was noted that Plaintiff was prescribed HCTZ and Lisinopril

and that the prescriptions were active until June 2, 2020. *Id*. Plaintiff's blood pressure

reading was 141/90, and Caldwell noted that Plaintiff's hypertension/cardiac outcome

was good and that his condition was stable. *Id*. Caldwell did not refer Plaintiff to an offsite

cardiologist or note that Plaintiff made any complaints. *Id*.

On February 21, 2020, Plaintiff returned to Centralia from a medical furlough with

audiology. (Doc. 110, Exh. 3, p. 31). The nurse noted that Plaintiff denied any changes in

his condition, and he noted no additional needs or concerns. *Id.* Plaintiff's blood pressure was 150/97. *Id.*

On February 24, 2020, Santos saw Plaintiff for a follow-up after his furlough with audiology. (Doc. 110, Exh. 3, p. 32). Santos noted that Plaintiff made no complaints and that his hearing test had returned within normal limits. *Id.*  Plaintiff's blood pressure was recorded as 122/74. *Id.*

On June 1, 2020, Defendant Santos left his position as Medical Director at Centralia Correctional Center, and Plaintiff's care was taken over by other medical staff. (Doc. 110, Exh. 2, p. 10).

On July 8, 2020, Plaintiff saw former Defendant Dr. Shah in the asthma, general medicine, and hypertension clinic. (Doc. 110, Exh. 3, p. 156-157). It was noted that Plaintiff was prescribed HCTZ and Lisinopril and that the prescriptions were active until January 16, 2020. *Id.* Plaintiff's blood pressure reading was 134/74. *Id.* Shah found Plaintiff's hypertension and cardiac outcome to be good and stable. *Id.* Shah did not find an outside referral necessary at this time. *Id.*

On February 2, 2021, Plaintiff saw former Defendant Dr. Pelegrin for complaints of acid reflux and hernia pain; he also requested a low bunk permit. (Doc. 110, Exh. 3, p. 44). Pelegrin noted that Plaintiff self-reported an abdominal hernia since 2018, and the hernia belt was not helping. *Id.* Plaintiff also self-reported that his hernia pops out when climbing onto the top bunk. *Id.* Pelegrin observed a small reducible herniation in the abdominal wall on the left side just below the bottom of the rib cage. In response, Pelegrin granted Plaintiff's low bunk permit for one year and instructed him to wear the

abdominal belt and to report if his hernia got any worse. *Id.*

On February 19, 2021, Plaintiff underwent an EKG which showed a normal sinus rhythm. (Doc. 110, Exh. 3, p. 131).

On February 24, 2021, non-party Dr. Percy Myers ("Myers") saw Plaintiff in the asthma, general medicine, and the hypertension chronic clinics. (Doc. 110, Exh. 3, p. 158-159). Plaintiff's blood pressure was reading 138/73, and Myers noted that Plaintiff's hypertension/cardiac outcome was good and that his condition was stable. *Id.* Myers did not refer Plaintiff to an offsite cardiologist or note that Plaintiff had any complaints about the management of his hypertension. *Id.*

Plaintiff saw Dr. Myers again in the asthma, general medicine, and the hypertension chronic clinic on September 14, 2021. (Doc. 110, Exh. 3, p. 160-161). Plaintiff's blood pressure reading was 131/77, and Myers noted that Plaintiff's hypertension/cardiac outcome was good and that he was stable. *Id.* Myers did not refer Plaintiff to an offsite cardiologist or note that Plaintiff had any complaints about his treatment management. *Id.* Dr. Myers then renewed Plaintiff's HCTZ and Lisinopril prescriptions for one year. *Id.* at p. 45.

On March 10, 2022, non-party Josh Smith, P.A. ("Smith") saw Plaintiff in the asthma, general medicine, and hypertension chronic clinics. (Doc. 110, Exh. 3, p. 162-163). Plaintiff's blood pressure readings were 110/66 and 129/66. *Id.* Smith found Plaintiff's cardiac and hypertension outcomes to be good, noting that his condition was stable. During Smith's physical examination of Plaintiff, he observed Plaintiff's abdominal wall hernia and referred Plaintiff to general surgery for hernia repair. *Id. See also* (Doc. 110,

Exh. 3, p. 55, 69, 73). However, Smith did not refer Plaintiff to an offsite cardiologist or note that Plaintiff had any complaints about his hypertension. *Id.* at 162-163.

Plaintiff saw an offsite general surgeon, Dr. Merrilee Brandt ("Brandt"), on April 1, 2022. (Doc. 110, Exh. 3, p. 55-58). Brandt assessed that Plaintiff had an abdominal hernia without obstruction and without gangrene. *Id.* at p. 57. Dr. Brandt recommended an abdominal CT scan without contrast. *Id.* She noted that if the CT imaging showed a posterior rectus sheath fascial defect, Plaintiff should be scheduled for surgery. *Id.* at p. 58. Brandt did not prescribe or recommend pain medications for Plaintiff. *Id.* Plaintiff underwent the abdominal CT on May 13, 2022, which showed increased colon and rectal content, but no renal calculi (kidney stones) or obstructive uropathy (urinary tract disorder causing obstruction). *Id.* at p. 71-72, 76-77.

On May 7, 2022, a nurse practitioner saw Plaintiff for a request to speak with the doctor about changing his blood pressure medications because he heard there was a recall of the HCTZ, and Lisinopril made him cough. The nurse referred him to a physician. (Doc. 110, Exh. 3, p. 46). Dr. Myers discontinued Lisinopril and prescribed Plaintiff Norvasc (calcium-based blocker used to treat high blood pressure) at 20mg for one year. *Id.* at p. 50.

On May 18, 2022, Plaintiff had a M.D/N.P./P.A. visit where his blood pressure was 129/81. (Doc. 110, Exh. 3, p. 51).

On May 24, 2022, Plaintiff saw Dr. Myers for a follow-up after his medical furlough. *Id.* Plaintiff's blood pressure was 125/73. *Id.* Myers noted that the CT did not show any evidence of a hernia but noted that Plaintiff had excess stool. *Id.* Myers

prescribed Plaintiff a saline laxative (magnesium citrate). *Id.*

On July 15, 2022, non-party Dr. Alberto Butalid ("Butalid") saw Plaintiff in the asthma, general medicine, and the hypertension chronic clinic. (Doc. 110, Exh. 3, p. 136-137). Plaintiff's blood pressure reading was 131/79, and Butalid noted Plaintiff's hypertension/cardiac outcome was good and stable. *Id.* Butalid did not refer Plaintiff to an offsite cardiologist or indicate that Plaintiff expressed any concerns about his care. *Id.*

Plaintiff's low bunk permit was renewed for one year on November 28, 2022. (Doc. 110, Exh. 3, p. 132).

On August 1, 2023, Myers noted that Plaintiff self-reported that the abdominal binder was taken from him and that he had seen a surgeon in the past. (Doc. 110, Exh. 3, p. 133). Myers observed a small reducible abdominal hernia. *Id.* Myers ordered a 36-inch abdominal binder for Plaintiff. *Id.* Plaintiff was issued the abdominal binder on August 30, 2023. *Id.* at p. 135.

**B.    Plaintiff's Deposition**

Plaintiff was deposed on October 30, 2023. (Doc. 113, Exh. 1). Plaintiff reported that Defendant Jones denied him access to medical care when he was "really hurting." *Id.* at p. 28:3-12. Jones was working the second shift at the time of Plaintiff's complaints of hernia pain. *Id.* at p. 47:19-23. Plaintiff acknowledged that his allegations against Defendant Jones would be limited to January 22 or 23, 2021. *Id.* at p. 34:11-21. Plaintiff reported that he was responsible for moving his belongings to another cell house during this period and that moving the heavy boxes exacerbated his hernia pain. *Id.* at p. 36:18-37:10.

Plaintiff stated that the only evidence he has on Jones was that "he was the officer [he] would . . . repeatedly ask . . . for help three days straight and he denied that help and didn't give [Plaintiff] the health care treatment." (Doc. 113, Exh. 1, p. 37:18-22). Plaintiff claims that he told Jones that he was in pain around his hernia area, that it was hard to breathe in his cell, and that he needed to see a doctor. *Id.* at p. 39:6-10. In response, Plaintiff asserts that Jones repeatedly told him that he was busy or that there was a lot going on. *Id.* at p. 39:12-19. Plaintiff indicated that he submitted nurse sick call slips before and after his encounters with Jones. *Id.* at p. 41:21-42:7. Plaintiff could not recall whether he made requests of the first shift officers or third shift officers regarding his "excruciating" hernia pain. *Id.* at p. 49:9-14; p. 47:47:24-48:4.

Plaintiff was asked whether he had any evidence to show that his hernia condition worsened between January 22 and 23, 2021. (Doc. 113, Exh. 1, p. 53:15-18). Plaintiff stated that he suffered from pain during that time and that his condition worsened because he was forced to endure the pain for an extended period when the issue could have been handled. *Id.* at p. 53:19-24. However, Plaintiff acknowledged that he did not have any medical evidence that his condition worsened. *Id.* at p. 53:25-54:8. Additionally, Plaintiff agreed that no medical provider had ever recommended Plaintiff have surgery to repair his hernia. *Id.* at p. 130:16-18.

Plaintiff indicated that he was suing Defendant Dr. Santos because he "would not give [him] anything for his [hernia] pain." (Doc. 113, Exh. 1, p. 78:25-79:21). Plaintiff claims that he told Santos "right away" about his hernia when he was transferred to Centralia. *Id.* at p. 85:14-15. He also stated that Santos hit his hernia with a clipboard while

he was examining him. *Id.* at p. 79:1-7.

Plaintiff also recalled being seen by the HCU upon his arrival at Centralia because his blood pressure was very high. (Doc. 113, Exh. 1, p. 88:16-18). Plaintiff agreed that his blood pressure improved after taking the medications prescribed by Dr. Santos. *Id.* at p. 114:12-21. However, he asserts that he told Santos he was experiencing a cough from the Lisinopril and that Santos ignored his complaint. *Id.* at p. 115:1-116:3. Plaintiff did not request to be on a different medication because he was not aware that Lisinopril would give him a cough. *Id.* p. 115:4-116:3. Plaintiff agreed that Dr. Santos could not provide him with care after he left Centralia. *Id.* at p. 126:1.

## C.    Dr. Santos's Declaration

Defendant Dr. Santos was employed as Medical Director of Centralia from September 1, 2011, until June 1, 2020. (Doc. 110, Exh. 2, p. 1). As Medical Director at Centralia, it was not his responsibility to schedule visits on the MD call line. *Id.* at p. 9. From June 1, 2020, until February 2, 2021, Santos was employed by Wexford Health Sources, Inc. as an as-needed Traveling Medical Director until he retired. *Id.* at p. 1.

Santos indicates that a normal blood pressure reading is 120/80 or lower. (Doc. 110, Exh. 2, p. 3). However, Santos states that blood pressure is high if it reads 130/80 and is considered stage 2 high blood pressure at 140/90 or higher. *Id.* Santos believes that if a patient has a blood pressure reading of 180/110 or higher more than once, the patient should seek medical treatment. *Id.*

Santos reviewed the results of Plaintiff's June 2, 2019, EKG on June 3, 2019. (Doc. 110, Exh. 2, p. 6). Santos noted that the results of Plaintiff's EKG showed sinus

bradycardia, and it was considered a "borderline EKG." *Id.* However, Santos opted to hold off on further testing or medications to see how he responded to the Lisinopril and HCTZ. *Id.*

Santos notes that it was his custom and practice to document any complaints during a visit in his exam notes. (Doc. 110, Exh. 2, p. 7, 8). Additionally, if Plaintiff had expressed to Santos that he was experiencing pain at any time, he would have documented this complaint in Plaintiff's medical records and considered prescribing pain medications. *Id.* at p. 12. If this pain were related to pain with climbing, Santos would have considered providing Plaintiff a low bunk permit. *Id.*

In Santos's experience, patients with small reducible hernia find relief from discomfort with an abdominal binder or hernia belt. (Doc. 110, Exh. 2, p. 8). When Santos initially located Plaintiff's hernia on July 23, 2019, Santos did not believe, based on his education, knowledge, training, and skills as a physician, that it was medically necessary to refer Plaintiff to an offsite surgeon or to request diagnostic imaging as the binder should have provided Plaintiff with adequate relief. *Id.*

Upon reviewing Plaintiff's medical chart, Santos did not treat Plaintiff after June 1, 2020. (Doc. 110, Exh. 2, p. 10).

## LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant

bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants*, *Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in factfinding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), *aff'd*, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade*

*Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

DISCUSSION

**A.      Dr. Santos's Motion for Summary Judgment**

Defendant Santos argues that summary judgment should be granted regarding his treatment of Plaintiff's hernia and chest pain. (Doc. 110, p. 16-20). Defendant Santos argues that Plaintiff's hernia did not amount to a serious medical need, and, alternatively, his treatment of Plaintiff's hernia did not amount to deliberate indifference. *Id.* With respect to Plaintiff's chest pain, Santos asserts that he was not deliberately indifferent because he provided Plaintiff with prompt and appropriate care for his complaints. *Id.* at p. 18-19. Plaintiff responds that he was sent to his cell with very high blood pressure for three or four days straight, that he had a very slow heartbeat and "heart pain" that was never treated, and that he never received anything for his hernia pain. (Doc. 117, p. 5). Ultimately, the Court agrees with Defendant Santos that Plaintiff's hernia did not represent a serious medical need and that his chest pain was adequately addressed under Santos's care.

To establish an Eighth Amendment violation by a prison official for failure to

provide adequate medical care, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021) (citing *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

A hernia can constitute a serious medical need in certain situations. When analyzing claims related to deliberate indifference to a hernia, the Seventh Circuit has considered the severity of the plaintiff's pain and side effects, whether the hernia was bulging or protruding, how long the hernia had been present, and whether the hernia required surgical intervention. *See, e.g., Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (where the plaintiff "had been suffering from his hernia for almost seven years, and during the last two of those years his hernia continued to worsen, was constantly protruding, and was causing extreme pain"); *Heard v. Sheahan*, 253 F.3d 316, 317 (7th Cir. 2001) (where the plaintiff's hernia was a prominent bulge in the groin area that caused numbness in the plaintiff's thigh and significant pain, especially after eating; physicians also recommended surgery); *Chapman v. Keltner*, 241 F.3d 842, 844-846 (7th Cir. 2001) (where the plaintiff's hernia developed after a surgical incision stretching nine inches across the plaintiff's lower abdomen and pelvic area had separated post bowel resection surgery). *See also Davis v. Wexford of Indiana, LLC*, No. 1:22-cv-00488-SEB-TAB, 2024 WL 691295, at *5 n.1 (S.D. Ind. Feb. 16, 2024) (where plaintiff had presented several pieces of

medical evidence including requests for imaging due to concerns about hernia strangulation, a surgical consultation, and a surgeon declaring that surgery was warranted).

Unlike those cases, Plaintiff's "hernia" did not amount to a serious medical need during the time that Defendant Santos treated him. Plaintiff first complained of an abdominal hernia to nursing staff on July 21, 2019. (Doc. 110, Exh. 3, p. 16). While Plaintiff reported to nursing staff that he had first noticed the hernia a year ago, the nurse did not observe a hernia but found that Plaintiff's abdominal area was tender to the touch. *Id.* Santos saw Plaintiff two days later on July 23, 2019, regarding his complaints of left upper quadrant pain. *Id.* at p. 17. Santos observed a small palpable lump with no tenderness, bulging or pain. *Id.* In response, Santos ordered an abdominal binder for Plaintiff, which was issued to him on August 2, 2019. *Id.* at p. 17-18. Santos issued the binder to Plaintiff, because in his experience, patients with small reducible hernias find relief with such equipment. (Doc. 110, Exh. 2, p. 7-8). Plaintiff did not complain about the abdominal binder's ineffectiveness until he saw Dr. Pelegrin on February 2, 2021, over six months after Santos left his position as Medical Director at Centralia. (Doc. 110, Exh. 3, p. 44, 166). Moreover, Plaintiff's CT scan from March 2021 did not show any evidence of a hernia, but only demonstrated that Plaintiff had excess stool. Between 2019 and 2022, no medical professional ever recommended that Plaintiff receive surgery for his hernia. (Doc. 110, Exh. 1, p. 135:13-16). Additionally, despite Plaintiff's awareness that he could purchase Ibuprofen and Tylenol for pain relief from the commissary, he never attempted to do so, even though his hernia was causing him pain. (Doc. 110, Exh.1, p. 82:10-13). These facts,

including the lack of any medical recommendation for surgery, the low level of pain experienced by Plaintiff, the lack of imaging confirming the existence of the hernia, and the fact that Plaintiff's hernia eventually was classified as reducible, lead the Court to conclude that Plaintiff's hernia did not amount to a serious medical condition.

Even if Plaintiff's hernia did amount to a serious medical condition, it does not follow that Defendant Santos was deliberately indifferent because he did not prescribe the precise treatment Plaintiff wanted. Unless no minimally competent professional would have chosen the same course of treatment under the circumstances, courts defer to the treatment decisions of medical professionals. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Sain v. Wood,* 512 F.3d 886, 894–895 (7th Cir. 2008)). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (citing *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006)). This is because "the Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126. Neither is a mistake in professional judgment alone enough to establish deliberate indifference. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). In essence, a doctor's treatment must be so blatantly inappropriate as to be divorced from any medical judgement to constitute deliberate indifference. *See Anderson v. Randle*, No. 11-1890, 451 Fed. Appx. 570, 572 (7th Cir. Nov. 23, 2011).

In Santos's judgment, he determined the proper course of treatment for Plaintiff's hernia was an abdominal binder. (Doc. 110, Exh. 3, p. 17-18). That Plaintiff was

dissatisfied with this course of treatment is not enough to establish deliberate indifference. *See Pyles*, 771 F.3d at 403. *See also Grund v. Murphy*, No. 17-3025, 2018 WL 2747543, at *2 (7th Cir. June 7, 2018) (stating that "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference."). The evidence does not show that "no minimally competent professional" would have treated Plaintiff's hernia this way. *Pyles*, 771 F.3d at 409. In fact, it suggests the opposite: another treating physician, Dr. Myers, also prescribed Plaintiff with an abdominal binder for his hernia four years later. *Id.* at p. 133-135. And, even if Santos's decision to treat the hernia with an abdominal binder was a mistake, negligence, or malpractice, that still would not be enough to violate the Eighth Amendment. *See, e.g.*, *Estelle*, 429 U.S. at 106 (noting that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Accordingly, no reasonable jury could conclude that Santos treated Plaintiff's hernia with deliberate indifference.

As to Plaintiff's chest pain, Defendant Santos does not contest that this amounted to a serious medical condition. (Doc. 110, p. 18-19). Accordingly, the Court will only consider whether Defendant Santos's care of such pain amounted to deliberate indifference.

To show that a medical professional exhibited deliberate indifference, an inmate must show that the defendant actually knew of, but disregarded, a substantial risk to the inmate's health. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). It is well settled that mere negligence is not enough to establish a defendant's deliberate indifference. *See, e.g.*,

*Davidson v. Cannon*, 474 U.S. 344, 347-348 (1986). Rather, deliberate indifference is more comparable to criminal recklessness. *See Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021) (citing *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)). The Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)).

In response to Defendant Santos's Motion for Summary Judgment, Plaintiff recounts an incident on an unspecified date where he experienced high blood pressure along with headaches and dizziness for several days before being admitted to the HCU. (Doc. 117, p. 5-6). Plaintiff was allegedly told in the HCU that he had a slow heartbeat. *Id.* at p. 6. Plaintiff concludes that the slow heartbeat was caused by several days of high blood pressure and that he should have been sent to the hospital at that time to check for stroke or heart attack. *Id.* In reply, Defendant Santos notes that Plaintiff received an EKG on June 2, 2019, while he was in the HCU. (Doc. 119, p. 2). The EKG results were "borderline," meaning that the EKG results were not entirely normal but were not conclusively abnormal. (Doc. 110, Exh. 3, p. 128). Santos had already prescribed Plaintiff Lisinopril and HCTZ and ordered that Plaintiff receive blood pressure checks for five days before the borderline EKG. (Doc. 110, Exh. 2, p. 5). Plaintiff's blood pressure then steadily declined after Plaintiff started taking his blood pressure medications as

prescribed.[2] Throughout this time, Plaintiff was being monitored in the hypertensive chronic care clinic, where medical professionals found that his cardiac and hypertension outcomes were good, and his condition was stable at each visit. *See* (Doc. 110, Exh. 3, p. 152-157). Plaintiff then received another EKG on February 19, 2021, that showed normal sinus rhythm. *Id.* at p. 131.

Like his hernia, Plaintiff clearly disagreed with Dr. Santos's treatment plan for his chest pain. Once again, however, Plaintiff's disagreement with Santos's care plan does not mean that Santos acted with deliberate indifference. Plaintiff was monitored in the HCU over a three-day period for his high blood pressure. He was also provided with medication, administered an EKG, and placed in the hypertension chronic care clinic to monitor his condition regularly. Plaintiff's blood pressure did not reach the level where Plaintiff needed to be sent to a hospital for further care. Accordingly, the Court finds in favor of Defendant Santos on both of Plaintiff's claims.

**B.    Brian Jones's Motion for Summary Judgment**

Defendant Jones argues that Summary Judgment should be granted in his favor because Plaintiff's condition from January 22 - 23, 2021 did not rise to the level of a serious medical need. (Doc. 113, p. 8). Alternatively, Defendant Jones asserts that Plaintiff cannot prove the delay in care caused him any additional harm separate from his preexisting underlying medical conditions. *Id.* at p. 11-12. In response, Plaintiff has supplied the

---

[2]    Plaintiff's blood pressure from June 2019 to March 2023, generally showed a decline once Plaintiff began taking the medications prescribed by Dr. Santos. Plaintiff's blood pressure readings during this time were: 155/92, 147/95, 162/91, 151/78, 142/78, 135/72, 122/63, 139/76, 141/76, 136/75, 135/77, 133/69, 135/81, 141/90, 150/97, 122/74, 134/74, 138/73, 110/66, 129/66. *See* (Doc. 110, Exh. 3, p. 14-16, 20, 31-32, 152-159, 162-163).

Court with statements from several fellow inmates, all of whom allegedly observed Plaintiff Jones denying Plaintiff access to the HCU when he was in severe pain. (Doc. 116, p. 2); *see also* (Doc. 116, p. 8-14). Plaintiff also claims that scrotal schists were found shortly after the incident. *Id.* at p. 2. Ultimately, the Court believes that Plaintiff has pointed to sufficient evidence in the record to create a dispute of material fact as to whether Jones was deliberately indifferent to his condition.

Severe and ongoing pain qualifies as a serious or excessive risk to health for the purposes of deliberate indifference claims. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). Indeed, "deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim," even without a claim that a delay in treatment caused a separate, excessive risk to health. *Smith v. Knox County Jail*, 666 F.3d 1037, 1039-1040 (7th Cir. 2012). *See also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (noting that "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.").

At this stage, the parties' arguments on this point demonstrate that Plaintiff's pain is a disputed fact, and the Court will not weigh the credibility of the competing evidence at this stage. *See Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008). Plaintiff has provided the Court with witness statements from several inmates indicating that Defendant Jones denied Plaintiff access to medical care when he was in severe pain. One inmate, Eddie Shields, specifically wrote that he witnessed Defendant Jones "repeatedly deny inmate Kennedy . . . the healthcare unit" and that he could see that Plaintiff was in "major pain"

and that he did not see Plaintiff getting treatment the night of January 22, 2021. (Doc. 116, p. 13). While Defendants point out that Plaintiff did not seek over the counter medications for his pain and could not recall which officers he asked assistance from, these factors are not dispositive to the possibility that a jury could find that Plaintiff's pain was of the severity that a delay in treatment amounted to deliberate indifference.

CONCLUSION

For the reasons delineated above, Defendant Santos's Motion for Summary Judgment is **GRANTED** (Doc. 109), and Defendant Jones's Motion for Summary Judgement is **DENIED** (Doc. 112). The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Santos at the conclusion of the case.

**IT IS SO ORDERED.**

**DATED:  March 26, 2025.**

Digitally signed by Judge Sison
Date: 2025.03.26 11:01:57 -05'00'

_____
**GILBERT C. SISON**
**United States Magistrate Judge**